# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

  v.                                           **Case No. 04-CR-190**

**MICHELLE WILLIS**
       **Defendant.**

## SENTENCING MEMORANDUM

Defendant Michelle Willis pleaded guilty to interstate transportation in aid of unlawful activity, contrary to 18 U.S.C. § 1952(a)(3). The charge arose out of defendant's agreement to help drive Jerry Rodriguez, her then-boyfriend and a crack dealer, and several of his confederates from Wisconsin to the Upper Peninsula ("U.P.") of Michigan to distribute his product. Rodriguez brought nine ounces (about 255 grams) of crack on the trip.

The probation office prepared a pre-sentence report ("PSR") in anticipation of sentencing, which set defendant's offense level at 31 (base level 34, U.S.S.G. §§ 2E1.2(a)(2) & 2D1.1(c)(3), minus 3 for acceptance of responsibility, § 3E1.1)[1] and her criminal history category at II, producing an imprisonment range of 121-151 months under the advisory sentencing guidelines. However, because the statutory maximum under § 1952(a)(3)(A) is five years, 60 months became the guideline range under U.S.S.G. § 5G1.1(a).

After considering all of the sentencing factors set forth in 18 U.S.C. § 3553(a), I decided

---

[1] In § 1952 cases, the court applies U.S.S.G. § 2E1.2. That guideline, in turn, directs the court to the guideline applicable to the underlying unlawful activity, here, drug trafficking. Under the drug trafficking guideline, offenses involving 150 to 500 grams of crack cocaine carry a base offense level of 34. U.S.S.G. § 2D1.1(c)(3).

to impose a non-guideline sentence of 12 months and 1 day. In this memorandum, I set forth the reasons for the sentence imposed.

## I. SENTENCING FACTORS

Section 3553(a) sets forth the factors the sentencing court must consider:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the advisory guideline range;

(5)  any pertinent policy statements issued by the Sentencing Commission;

(6)  the need to avoid unwarranted sentence disparities; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The guidelines remain a significant sentencing consideration, even after <u>United States v. Booker</u>, 543 U.S. 220 (2005) demoted them from mandatory to advisory status. However, it is clear that the court must now base the sentence on all of the factors set forth in § 3553(a). See <u>United States v. Cull</u>, 446 F. Supp. 2d 961, 963 (E.D. Wis. 2006). Thus, while the Seventh Circuit has held that on appeal a sentence within the guideline range is considered

2

presumptively reasonable, United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005), the same is not true at the district court level. Indeed, the district court is not permitted "to 'presume' that a sentence within the guidelines range is the correct sentence." United States v. Demaree, 459 F.3d 791, 794 (7th Cir. 2006). Rather, the judge need only "consider the guidelines and make sure that the sentence he gives is within the statutory range and consistent with the sentencing factors listed in 18 U.S.C. § 3553(a)." Id. at 795. The ultimate command of § 3553(a) is, after considering all of the relevant factors, to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes set forth in sub-section (a)(2) – just punishment, deterrence, protection of the public and rehabilitation of the defendant. 18 U.S.C. § 3553(a). This is the so-called parsimony provision, which directs the court to impose the minimum term necessary to comply with the statutory goals of sentencing.

## II. DISCUSSION

### A. Nature of Offense

As noted, defendant drove Rodriguez, her then-boyfriend, and several of his associates to the U.P. so they could distribute crack. Defendant did not plan the trip, personally handle drugs or profit from Rodriguez's activities. She simply drove Rodriguez's vehicle; she also rented a hotel room for Rodriguez and herself in the U.P. Rodriguez sold about nine ounces of crack during the trip, which translated to roughly 255 grams.

### B. Defendant's Character and Background

Defendant was twenty-seven years old and had a minimal prior record, consisting of two retail theft cases when she was a teenager and a misdemeanor possession case from 2004. In the latter case, defendant, a passenger in a car pulled over by police, was found to be

3

holding bags of powder cocaine, which had apparently been handed to her by another occupant of the car shortly before the search.

Aside from her record, defendant's background was quite positive. Despite a difficult childhood, with an alcoholic mother who was in and out of in prison, which required defendant to at times be raised by her grandmother, she graduated high school. She went on to college, but had to drop out to help care for her younger siblings due to her mother's inability to do so consistently. She later got a job with the state Department of Corrections, which she held from 2000 to 2004 but lost following her arrest on the drug charge. For a time she operated a daycare center and at the time of sentencing she worked at Menard's.

Defendant had broken off her relationship with Rodriguez and involved herself with a man who worked as a drug counselor at Genesis Behavioral, which seemed to be a positive development. He spoke very highly of her and explained some of the pressures that contributed to her earlier criminality. Defendant's mother also told the PSR writer that defendant had been very patient with and supportive of her. I received positive letters from her pastor, who stated that defendant volunteered at the church and was a role model for younger members, a cousin and a childhood friend, who also spoke of defendant's good qualities. A full gallery of defendant's supporters appeared at her sentencing. In sum, defendant seemed bright and full of potential but had been held back by difficult family circumstances and poor choices in companions.

**C.    Purposes of Sentencing**

I saw little evidence that defendant was likely to re-offend, see 18 U.S.C. § 3553(a)(2)(C), but some confinement was necessary to promote respect for the law and deter others given the seriousness of the offense, see §§ 3553(a)(2)(A) & (B). Defendant had no

4

correctional treatment needs. See § 3553(a)(2)(D).

**D.     Guidelines**

The guidelines called for a term of 121-151 months, but with a statutory maximum of five years under 18 U.S.C. § 1952(a)(3)(A), 60 months became the range under U.S.S.G. § 5G1.1(a). For several reasons, under the specific circumstances of this case, such a sentence was greater than necessary to satisfy the purposes of sentencing.

   **1.     Defendant's Role in the Offense**

First, a sentence of five years was greater than necessary given defendant's limited role in the offense. Defendant understandably did not request a guideline role reduction under U.S.S.G. § 3B1.2. Even with a 4 level reduction under § 3B1.2(a), the range was still well above the statutory maximum.

However, in imposing sentence under § 3553(a) in the present case, the more relevant range was that set by the statute of conviction, 0-5 years. In determining where to sentence defendant within that range, under § 3553(a)(1), I considered her mitigated role as a driver who did not plan the trip, prepare the crack, engage in any actual dealing once the crew arrived or profit from the venture.[2] Under these circumstances, a sentence at the statutory maximum was greater than necessary to provide just punishment and reflect the seriousness of the offense. See 18 U.S.C. § 3553(a)(2)(A).

---

[2]Section 1952 requires that, following the travel or transportation, the defendant "carry on an unlawful activity." Federal Criminal Jury Instructions of the Seventh Circuit 300 (1999) (third element). In the present case, it was Rodriguez, also charged in the § 1952 count to which defendant pleaded guilty, who performed the requisite act. While defendant was properly held liable for the offense, see 18 U.S.C. § 2, for purposes of sentencing under § 3553(a), her role in the statutory offense was properly considered minimal.

5

**2. Reason for Defendant's Involvement**

Second, I found a sentence of five years greater than necessary in light of the fact that defendant's involvement in this case arose solely from her relationship with Rodriguez. He asked her to assist him in driving to the U.P.; she was not a dealer in her own right and did not stand to gain financially by helping him.

I addressed a similar situation in United States v. Greer:

[D]efendant's relationship to the conspiracy was marginal, and it resulted entirely from her relationship to several males. The Public Safety, Sentencing and Incarceration Reform Caucus of the U.S. House of Representatives recently held a briefing on "The Girlfriend Problem: How Sentencing Laws Affect Women and Children," stating:

> Women are the fastest growing group in the ever-expanding prison population. Sentencing laws have caused the number of women behind bars to explode, leaving in the rubble displaced children and overburdened families. Current drug laws punish not just those who sell drugs, but also a wide range of people who help or associate with those who sell drugs.
>
> The length of a sentence usually depends on the quantity of drugs a person possesses or distributes. Where a person is charged with conspiracy in a drug crime, sentences often reflect the total amount of drugs possessed or sold by everyone in the operation. As a result, even when they have minimal, if any, involvement in the drug trade, non-violent women with little or no prior criminal history are increasingly captured in the ever widening net cast by the war on drugs. They are often subjected to the same, or in some cases, harsher sentences than the principals in the drug trade at whom the sentencing statutes were aimed. In too many cases, women are punished for the act of remaining with a boyfriend or husband engaged in drug activity, who is typically the father of her children. Many of these women have histories of physical and sexual abuse and/or untreated mental illness. Ill-informed policies spawned by the war on drugs adversely impact children. In 1999 almost 1.5 million minor children had an incarcerated parent, with over 65% of women incarcerated in state prison having a minor child. The children are often placed in the care of friends or family – often leading to financial and emotional hardships – or end up in an overburdened child welfare system

6

> where they are at increased risk of becoming victims of sexual or
> physical abuse or neglect.
>
> See Legislative Briefing on "The Girlfriend Problem," at
> http://sentencing.typepad.com/sentencing_law_and_policy/2005/06/legislative
> _bri.html (last visited June 27, 2005).

375 F. Supp. 2d 790, 794-95 (E.D. Wis. 2005). As in Greer, defendant became involved in the instant criminal conduct at the insistence of her boyfriend, then faced a guideline range based on the amount of drugs he distributed.[3]

To her credit, defendant broke up with Rodriguez. Because she had little criminal propensity herself, with Rodriguez out of her life, she was not likely to re-offend. See United States v. Bowling, No. 04-CR-71, 2006 U.S. Dist. LEXIS 92600, at *18-19 (E.D. Wis. Dec. 20, 2006) (imposing non-guideline sentence where female defendant drawn into crime due to her relationship with an abusive man extricated herself from the bad relationship). Defendant's current relationship seemed much more positive, one that would help her stay out of trouble rather than create additional risks. Thus, I found the guideline term greater than necessary to protect the public from further crimes defendant might commit. See 18 U.S.C. § 3553(a)(2)(C).

### 3.     Positive Character Traits

Third, the guideline-recommended term failed to account for defendant's significantly positive personal characteristics. Despite her difficult upbringing, she accomplished a great deal, graduating from high school and compiling a solid work record. Were it not for the distraction of helping to care for her siblings, she likely would have graduated college, as well.

---

[3] It is also worth noting that when she was initially approached by law enforcement about her involvement with Rodriguez, defendant refused to cooperate against him. However, after he was charged, Rodriguez agreed to cooperate against her. Thus, in the present case, another aspect of the girlfriend problem was the lack of reciprocal loyalty.

7

She had substantial support in the community, as reflected by the many supporters who appeared in court and in the letters I received, which would assist in her re-integration into the community. For this reason as well, she was an unlikely recidivist. See 18 U.S.C. § 3553(a)(2)(C).

### 4. Crack Guideline

#### a. Status of Guideline Post-Booker

Finally, I was compelled to note that the guideline term in this case, even given the effect of the statutory maximum under U.S.S.G. § 5G1.1(a), was substantially elevated by the fact that the substance involved was crack cocaine. "As is now notorious, the guidelines create a 100 to 1 ratio between crack and powder cocaine." United States v. Smith, 359 F. Supp. 2d 771, 777 (E.D. Wis. 2005). In other words, the guidelines treat possession of 1 gram of crack cocaine the same as possession of 100 grams of powder cocaine. Id. (citing U.S.S.G. § 2D1.1(c)).

Following the issuance of the Booker decision, district courts began questioning whether the 100:1 ratio contained in the crack guideline produced sentences that are greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a). See, e.g., United States v. Perry, 389 F. Supp. 2d 278, 300-08 (D.R.I. 2005); Smith, 359 F. Supp. 2d at 777-82. As I noted in United States v. Leroy:

> there is no persuasive penological or scientific justification for treating 1 gram of crack the same as 100 grams of powder. The Sentencing Commission studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported. Specifically, the Commission concluded that: (1) the prevalence of aggravating factors in crack cases does not differ substantially from powder cocaine cases; (2) any pharmacological differences between crack and powder do not justify the disparity in penalties; (3) in comparison to the mid-80s, the use of crack has decreased; (4) the

8

unjustifiably harsh crack penalties disproportionately impact on black defendants and have increased racial disparity in federal sentencing, contrary to one of the Sentencing Reform Act's primary goals; (5) the disparity in sentences involving crack and powder brings irrationality into the criminal justice system, allowing guideline sentences to vary widely depending on whether the offender had cooked the powder into crack by the time of arrest; and (6) the 100:1 ratio results in lesser sentences for large scale suppliers of powder cocaine than the street level crack dealers who exist below them in the hierarchy of distribution. Thus, none of the previously offered reasons for the 100:1 ratio withstand scrutiny. In light of these well-supported findings by the Commission, a court acts well within its discretion under § 3553(a) in sentencing below the guideline range to account for the unreasonable inflation of sentences called for in crack cases. A court also acts well within its discretion in concluding that the guidelines create unwarranted disparity between crack and powder cocaine defendants, as well as racial disparity, contrary to § 3553(a)(6).

373 F. Supp. 2d 887, 891-92 (E.D. Wis. 2005) (internal citations omitted).

In Smith, I concluded, based on the Sentencing Commission's most recent study, that a 20:1 ratio better served the purposes of sentencing in § 3553(a) and reduced the disparity created by the guidelines. 359 F. Supp. 2d at 781-82. Other judges concurred. See United States v. Doe, 412 F. Supp. 2d 87, 93-94 (D.D.C. 2006) (citing cases).

However, several courts of appeals, including the Seventh Circuit, disagreed with this approach. In United States v. Jointer, the Seventh Circuit held that a "district court 'err[s] as a matter of law when it construct[s] a new sentencing range' based on a crack-to-powder range other than 100:1." 457 F.3d 682, 687 (7th Cir. 2006) (quoting United States v. Pho, 433 F.3d 53, 64 (1st Cir. 2006)). "A district court simply cannot substitute its own ratio for the 100:1 ratio." Id. (citing United States v. Williams, 456 F.3d 1353 (11th Cir. 2006); United States v. Eura, 440 F.3d 625 (4th Cir. 2006)). The Jointer court reversed the defendant's sentence based on a 20:1 ratio "[b]ecause the district court did not follow the appropriate methodology in sentencing." Id.

But the Jointer court did not hold that the crack guideline was sacrosanct. Rather, it

9

stated:

> To ensure that our holding is received in the proper context, we emphasize that, once a correct guideline sentence has been calculated, the district court must fashion an individual sentence for the defendant before it by evaluating all the facts and circumstances of the case in light of the criteria set forth by Congress in 18 U.S.C. § 3553(a). At this later stage of the sentencing proceedings, the Sentencing Commission's detailed reports on crack and cocaine sentencing may have practical utility to a district court's evaluation of the facts and circumstances of the individual case in light of the § 3553(a) factors. However, . . . the analysis and data contained in the reports cannot alone justify a below-guidelines sentence; they can be considered only insofar as they are refracted through an individual defendant's case. This is not to say, of course, that a district court must consult the Sentencing Commission reports in any given sentencing. Nor will reliance on the Sentencing Commission reports shield a district court from a reasonableness review on appeal because, at the core, the district court must still tie the § 3553(a) factors to the individual characteristics of the defendant and the offense committed.

Id. at 687-88 (internal footnote, citations and quote marks omitted).[4]

In subsequent cases, other courts of appeals have expanded upon this theme. In United States v. Gunter, 462 F.3d 237 (3d Cir. 2006), the Third Circuit held that district courts may vary from the crack guideline like any other. The court drew a distinction between the 100:1 ratio in 21 U.S.C. § 841(b), the drug trafficking statute, and the ratio contained in U.S.S.G. § 2D1.1, the drug trafficking guideline, stating:

> The Government fails to appreciate that while the statutory minimum drug trafficking penalty in 21 U.S.C. § 841(b), which reflects the 100:1 crack/powder cocaine ratio (i.e., "binding law"), is mandatory, the-above-the-statutory-minimum Guidelines ranges for drug trafficking penalties, which reflect the same ratio, are

---

[4] I wish to make clear that I did not in Smith or any other pre-Jointer case reject the crack guideline wholesale or adopt my own guideline for all crack cases. I first correctly computed the guidelines, then determined under § 3553(a) whether the sentence produced by the guidelines was greater than necessary. See Leroy, 373 F. Supp. 2d at 896 ("I did not alter the guidelines, which I had already determined. Rather, I imposed a non-guideline sentence using a 20:1 ratio to create a reference point."). In fact, in some pre-Jointer cases I declined to impose below-guideline sentences based on the 100:1 ratio. See, e.g., United States v. Alexander, No. 05-CR-213, slip op. at 6 (E.D. Wis. Feb. 21, 2006) (Sentencing Memorandum).

10

not after Booker. In other words, once between the minimum and maximum statutory ranges of 21 U.S.C. § 841(b), there is nothing special about the crack cocaine Sentencing Guidelines that makes them different, or less advisory, than any other Guidelines provision. Thus, the District Court erred under Booker in treating the crack/powder cocaine sentencing differential incorporated in the Guidelines as mandatory in imposing a final sentence.

. . .

Post-Booker a sentencing court errs when it believes that it has no discretion to consider the crack/powder cocaine differential incorporated in the Guidelines – but not demanded by 21 U.S.C. § 841(b) – as simply advisory at step three of the post-Booker sentencing process (imposing the actual sentence after considering the relevant § 3553(a) factors). . . .

Of course, the District Court is under no obligation to impose a sentence below the applicable Guidelines range solely on the basis of the crack/powder cocaine differential. Furthermore, although the issue is not before us, we do not suggest (or even hint) that the Court categorically reject the 100:1 ratio and substitute its own, as this is verboten. The limited holding here is that district courts may consider the crack/powder cocaine differential in the Guidelines as a factor, but not a mandate, in the post-Booker sentencing process.

Id. at 248-49 (internal citations and footnote omitted).

More recently, in United States v. Pickett, 475 F.3d 1347 (D.C. Cir. 2007), the D.C. Circuit discussed the district court's ability to vary from the crack guideline. The court first discussed the strong evidentiary basis for such a variance, based on the Commission's reports:

When it comes to the application of Guideline § 2D1.1 in crack cocaine cases, the Commission is one of its severest critics. For more than a dozen years, it has strongly recommended against retaining the 100-to-1 ratio. In its 2002 Report the Commission put the matter bluntly: "the Commission firmly and unanimously believes that the current federal cocaine sentencing policy is unjustified and fails to meet the sentencing objectives" in § 3553(a). 2002 Report at 91. The reasons are several. For one thing, "[c]rack's unique distribution pattern, in combination with the 100-to-1 quantity ratio, can lead to anomalous results in which retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." 1995 Report at 174. Although crack is more addictive than powder cocaine, the 100-to-1 ratio "greatly overstates the relative harmfulness of crack cocaine." 2002 Report at 93. Also, the "fact that a significant proportion of federal crack cocaine offenders are responsible for relatively small drug

11

quantities is troublesome because they receive especially disparate penalties in comparison to similar powder cocaine offenders." Id. at 98.

The disparities are not only between crack and powder cocaine dealers. In the Commission's opinion § 2D1.1 of the Guidelines is also a failure in distinguishing among crack offenders. The Guideline treats "all crack cocaine offenders as if they committed [harmful conduct such as violence], even though most crack cocaine offenders in fact had not." Id. at vii. In addition to serving "no clear purpose," § 2D1.1's use of the 100-to-1 ratio and its quantity-based approach threatens "public confidence in the federal courts" because it has had a disproportionate impact on African-American offenders, who in 2002 made up eighty-one percent of those sentenced for trafficking crack. 2004 Report at 131, 135. Although the Guidelines were meant to promote uniformity in sentencing, not to increase the length of sentences, § 2D1.1 also "had the effect of increasing prison terms far above what had been typical in past practice . . . ." Id. at 49.

In terms of the sentencing factors of § 3553(a), the Commission thus believes that its Guideline for crack distributors generates sentences that are "greater than necessary," exaggerates "the seriousness of the offense" of crack trafficking, does not "promote respect for the law," and does not "provide just punishment for the offense." 18 U.S.C. § 3553(a), (a)(2)(A). The Commission's self-assessment does not rest on the particulars of any one offender. The sentencing factors just mentioned, as well as § 3553(a)(2)(B), which deals with deterrence in general, and § 3553(a)(6), which deals with "unwarranted sentence disparities," are not entirely confined to the individual characteristics of the particular defendant. See United States v. Simpson, 430 F.3d 1177, 1186 (D.C. Cir. 2005). It therefore seems to us beyond doubt that the district court erred in refusing to evaluate whether sentencing Pickett in accordance with Guideline § 2D1.1, and its 100-to-1 ratio, would effectuate the purposes of sentencing set forth in § 3553(a).

Id. at 1353-54.

As in Gunter, the government argued in Pickett that the crack guideline is compelled by the ratio set forth in the corresponding statute, 21 U.S.C. § 841(b), and that "allowing district courts to examine or consider or take into account the untoward results of the 100-to-1 ratio in the Guideline would frustrate 'the will of Congress.'" Id. at 1354. The government further noted that Congress had not approved the Commission's views on the matter. Finally, the government argued that "judges have no business making 'policy choice[s],' which are for the

12

legislature." Id. at 1355.

The court rejected these arguments. First, the court noted that "Congress has set statutory minimums and maximums. As to where within that range a particular defendant's sentence should fall, § 841(b) is silent."[5] Second, the court agreed that Congress had not approved the Commission's reports on the problems caused by using the 100:1 ratio.

> But we do not understand why this matters. As far as the intent of Congress is concerned, it is the intent of the 1986 Congress, which enacted the mandatory minimums for crack and powder cocaine, that controls. The intent of later Congresses that failed to act on Commission recommendations is of no moment. But it remains of great importance that, in its recommendations, the Commission candidly and forthrightly exposed the weaknesses and failings of its Guideline with respect to crack cocaine sentencing.

Id. at 1355 (footnote omitted). Third, as to the "policy" issue, the court recognized that other circuits had rejected attempts by district judges to adopt and apply a ratio different from the current 100:1. Id. But this did not mean that district courts were forbidden to vary from the crack guideline, as the district judge in the case before it seemed to believe. Id. at 1356. Therefore, the court vacated the defendant's sentence and remanded for re-sentencing. Id.

The rule that emerges from Jointer, Gunter and Pickett is that while district courts may not construct their own alternative crack/powder ratio, neither are they required to impose a sentence under the current 100:1 ratio in the guidelines. Further, they can, in imposing an appropriate sentence in the individual defendant's case under § 3553(a), consider the Sentencing Commission's reports on the problems with the crack guideline. Finally, they may consider whether the aggravating circumstances that prompted the adoption of the 100:1 ratio are present in the case before them.

---

[5]As noted, in the present case, the statutory range was 0-5 years.

13

### b. Analysis of Crack Guideline in the Present Case

As indicated, the Seventh Circuit allows district courts to consider the problems with the 100:1 ratio but requires that such concerns be "refracted through an individual defendant's case." Jointer, 457 F.3d at 688. In the present case, for many of the same reasons discussed above, it was plain that the guideline term under § 2D1.1 was greater than necessary given defendant's specific conduct.

First, there was no evidence that defendant was involved in selecting or preparing the substance she helped to transport. Although it appeared that at some point she learned that Rodriguez and his associates had crack, that was not her choice. Under these circumstances, the guidelines produced a longer sentence for the uneducated driver of a crack dealer than for a wholesale drug distributor who supplied the powder cocaine from which Rodriguez produced the crack.

Second, the total amount transported was modest, and again there was no evidence that defendant was involved in selecting the amount, in cooking the powder into crack, in packaging it, or in the actual distribution once the group reached its destination. Had Rodriguez brought along 9 ounces of powder rather than 9 ounces of crack (or, perhaps, delayed cooking the powder into crack until after the group reached its destination), defendant's range would have been 27-33 months rather than 121-151 months. Thus, the guideline sentence was greatly disparate in comparison to a similar powder cocaine case. See 18 U.S.C. § 3553(a)(6).

Third, while § 2D1.1 treats all crack offenders as if they had engaged in harmful conduct such as violence, in the present case there was no evidence of such aggravating circumstances. Neither defendant nor any of her associates possessed a weapon or engaged

14

in any violence or threats. Nor was there any evidence of specific harmful effects on the community resulting from the offense, or of any specific victims of the crime.

Finally, defendant was African-American, as are the vast majority of those sentenced for trafficking in crack, while powder cocaine offenders are usually white. This raised the specter of racial disparity, the most pernicious type.

For all of these reasons, the crack guideline was a poor fit given the specific circumstances of this case.

### 5. Conclusion as to Guidelines

Therefore, under all of the circumstances of this case, I found that the sentence recommended by the guidelines was greater than necessary, exaggerated the seriousness of the offense, failed to promote respect for the law, and did not provide just punishment for the offense. Further, given defendant's minimal record and the circumstances of this case, the guidelines produced a sentence that was greater than necessary to protect the public from further crimes she might commit. Finally, I found the guideline sentence greater than necessary to deter others who engaged in similar misconduct and defendant from engaging in future criminality.

Defendant asked me to consider a sentence of probation, with or without community confinement. However, I found such a sentence insufficient to provide just punishment and promote respect for the law. Even given defendant's limited role, crack distribution is an extremely serious crime. A sentence involving no prison component would thus have unduly depreciated the seriousness of the offense. Further, as the government pointed out, defendant committed the instant offense just two months after her 2004 cocaine possession arrest, which suggested that a prison term, rather than the type of lenient treatment she received in the state

15

system,[6] was needed to deter her and promote respect for the law.

## III. CONCLUSION

Under all of the circumstances, I found a sentence of 12 months and 1 day sufficient but not greater than necessary. This sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself, while accounting for the mitigating circumstances discussed above. This sentence was also consistent with the recommendation made by the experienced probation officer assigned to the case, whose views of the offense and the offender I took into account.[7]

Therefore, I committed defendant to the custody of the Bureau of Prisons for 12 months and 1 day. I further imposed a fine of $1000, which I considered necessary to provide just punishment, payable upon defendant's release from prison at a rate of not less than $100 per month. Finally, I ordered her to serve a two year supervised release term, the conditions of which appear in the judgment.

Dated at Milwaukee, Wisconsin, this 28th day of March, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[6]Defendant received a fine in that case.

[7]The government agreed that such a sentence was reasonable.

16